UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


SCOTT A. BUDNICK,                    Case No. 26-CV-
                                     HON.
            Plaintiff,               MAG. JUDGE

vs.

CITY OF HAMTRAMCK,
ANDREW MILESKI, and
ALEXANDER LAGROU,
individually and in their
official capacities, and
jointly and severally,

            Defendants.
_____
GARY T. MIOTKE (P41813)
Attorney for Plaintiff
6828 Park Avenue
Allen Park, MI 48101
(313)-388-4809
gmiotke@miotkelawoffice.com

_____

## COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES the Plaintiff by and through his attorney, and for his

Complaint he states that:

## JURISDICTION, PARTIES, VENUE

1. This action arises out of the Plaintiff's employment.

1

2. Count I is an action to enforce civil rights pursuant to 42 USC 1983. This Court has jurisdiction over Count I pursuant to 28 USC 1331 and 28 USC 1343(a)(3) and (4).

3. This Court has jurisdiction over Count II and Count III by virtue of the doctrine of supplemental jurisdiction, 28 USC 1367.

4. Plaintiff is a resident of a municipality that exists within the Eastern District of Michigan, Southern Division.

5. Defendant, CITY OF HAMTRAMCK ("City") is a Michigan municipal corporation that exists by virtue of the laws of the State of Michigan within the Eastern District of Michigan, Southern Division.

6. Defendant, ANDREW MILESKI ("Mileski") is a resident of a municipality that exists within the Eastern District of Michigan, Southern Division and was for all times material to this Complaint the City's Deputy Police Chief.

7. Defendant, ALEXANDER LAGROU ("Lagrou") is a resident of a municipality that exists within the Eastern District of Michigan, Southern Division and was for all times material to this Complaint the City's Acting City Manager.

8. The events giving rise to this case arose within the Eastern District of Michigan.

2

BACKGROUND FACTS

9. For all times material to this Complaint, Plaintiff was a white, Irish-American, Roman Catholic person who had been employed by the City in its Police Department.

10. Plaintiff started his employment with the City in approximately 2021 when he became employed as a Police Officer.

11. Prior to being employed by the City, Plaintiff had been employed in law enforcement for over 30 years by both federal and State of Michigan law enforcement agencies. As such, Plaintiff was more than qualified to be a Police Officer.

12. Jamiel Altaheri ("Altaheri") was for all times material to this Complaint the City's Police Chief until the termination of his employment by the City.

13. Prior to Altaheri becoming the City's Police Chief, he and other candidates for the Police Chief position went through an interview process with the City Council, the Mayor, and City Manager wherein they discussed their qualifications for the position and issues pertaining to the Police Department.

14. This included at least two internal candidates who were already employed by the Police Department.

15. Additionally, on information and belief, Altaheri and the other candidates (including the internal candidates) also discussed their qualifications for

3

the position and issues pertaining to the Police Department privately with City Council members, the Mayor, City Manager, and others.

16. At no point were any of these internal candidates for the Police Chief position ever subjected to discipline or adverse actions based on the fact that they had discussed their qualifications for the position and issues pertaining to the Police Department with City Council members, the Mayor, the City Manager, or anyone else employed by the City or acting as an elected official of the City.

17. From 2021 to 2025, Plaintiff was employed by the City as a Police Officer.

18. However, the City's Police Department through Altaheri, posted for a Special Investigator position within the Department.

19. Plaintiff applied for the Special Investigator position pursuant to the application process.

20. In 2025, and due to his extensive experience in law enforcement, Plaintiff was appointed as a Special Investigator assigned to commercial auto theft.

21. On May 15, 2025, Altaheri scheduled a meeting for May 20, 2025.

22. On May 20, 2025, the meeting previously scheduled by Altaheri took place in Sgt. George's office. Present were Altaheri, Mileski, Sgt. George, Detective Strohauer, Detective Daugherty, Investigator David Adamczyk, and Plaintiff.

4

23. Upon approaching the room, Altaheri directed Plaintiff and Investigator Adamczyk, using a harsh and negative tone, to sit together on a small couch, a tone and treatment not directed at any other attendees.

24. Altaheri then abruptly instructed command staff to "Get the Sheriff from downstairs," despite no sheriff personnel being present in the building.

25. He claimed to have spoken with the Sheriff's office the day before regarding a fraud investigation position and immediately ordered Investigator Adamczyk to retrieve his equipment, escorted by Internal Affairs Sgt. Golla and Detective Strohauer.

26. Though no disciplinary incident had occurred to justify such action, Investigator Adamczyk complied.

27. Upon returning, Altaheri conducted the meeting in an aggressive and unprofessional manner, at one point pounding his fist on the desk next to Plaintiff, contradicting the collaborative tone he had promised in a prior written communication about the meeting. Altaheri also referred to Plaintiff and Investigator Adamczyk as "pussies" and threatened to have another employee body slam them.  Ultimately, he removed Plaintiff and Investigator Adamczyk from their assignments as Special Investigators, although Plaintiff was only temporarily removed but still went back to patrol duties.

5

28. Thereafter, Plaintiff and Investigator Adamczyk reported Altaheri's harassment and detailed the various violations of Hamtramck Police Department's Rules and Regulations, including but not limited to, harassment, ridicule, making offensive comments, engaging in bullying or intimidating acts, aggressive or hostile behavior, verbal abuse, failing his supervisor responsibilities, retaliation, and failure to respect subordinate ranked personnel.

29. On May 21, 2025, then City Manager Max Garbarino placed Altaheri on paid administrative leave to allow for a full, impartial investigation of Plaintiff and Investigator Adamczyk's complaints.

30. Similarly, on May 21, 2025, Garbarino ordered Mileski to place Investigator Adamczyk on paid administrative leave to protect him.

31. Yet, Garbarino's own plans to have a full, impartial investigation undertaken were disrupted by the City's Mayor Amer Ghalib and the City Council.

32. Shortly after Altaheri was placed on administrative leave, there was public backlash primarily from members of the Yemeni-American community who supported Altaheri, as a fellow Arab American.

33. On May 27, 2025, the City Council unanimously voted to place Garbarino on indefinite paid administrative leave.

34. Following this May 27th meeting, Ghalib made false statements against both Adamczyk and Garbarino.

35.   In early June 2025, the six City Council members voted to retain or contracted directly with the law firm known as Miller, Johnson, Snell & Cummiskey, P.L.C. allegedly "to conduct an independent, objective, and comprehensive investigation and provide legal advice to the City regarding allegations of misconduct against Police Chief Jamiel Altaheri, Officer David Adamczyk, and City Manager Max Garbarino."

36. Unsurprisingly, the Investigation Report concluded that there was sufficient justification to terminate the employment of Adamczyk and Garbarino.

37. Just as unsurprisingly, and allegedly based on the Investigation Report, the City Council voted (a) to terminate Garbarino and (b) to direct the Acting City Manager to direct Mileski to terminate Adamczyk.

38. The City Council also voted to direct the Acting City Manager to terminate Altaheri.

39. Consistent with the foregoing, Altaheri, Adamczyk, and Garbarino were terminated.

40. Due to Altaheri'a termination, the City engaged in a process to find an individual to become the Acting Police Chief.

41. Yet, the process used by the City differed from when Altaheri was selected as the Police Chief.

42. One difference was that the City intended to select an Acting Police Chief and then to select the Police Chief.

43. Another difference was that there was *not* the same interview process wherein the candidates discussed their qualifications for the position and issues pertaining to the Police Department.

44. Instead, candidates (including the internal candidates) discussed their qualifications for the position and issues pertaining to the Police Department privately with City Council members and the Mayor.

45. Plaintiff was one of the internal candidates for the Acting Police Chief position; and he was qualified for this position and for the position of Police Chief.

46. As such, he discussed his qualifications for the position and issues pertaining to the Police Department privately with City Council members and the Mayor-elect/Mayor.

47. In November and December 2025, Plaintiff was assured by City Councilmen that he was going to be selected as the Acting Police Chief.

48. Also, City Councilmen publicly introduced him at events as the next Acting Police Chief and/or Police Chief.

8

49. Plaintiff was actually told to purchase the uniform for the positions of Acting Police Chief and/or Police Chief; and he did so.

50. However, in the discussions with City Councilmen, Plaintiff learned that at least one City Councilman wanted radical change in the Police Department. Specifically, this City Councilman wanted the entire upper command staff of the Police Department to be fired and "gone".

51. On information and belief, this desire to remove the entire upper command staff of the Police Department was common among City Council members.

52. For his part and in his discussions with this City Councilman, Plaintiff disagreed with the idea of removing the entire upper command staff of the Police Department. This included stating that the City had to utilize progressive discipline to remove employees and that Plaintiff would stand in the way of anyone being unjustly fired.

53. Plaintiff continued to be assured that he was going to be selected as the Acting Police Chief based on his discussions with City Council members and their representatives.

54. Yet, unbeknownst to him, Plaintiff's statements to City Council members appeared to have had a negative impact not only on his prospects for

being selected as the Acting Police Chief but also on retaining his position as a City Police Officer.

55. For example, Lagrou told Plaintiff that "I'm saving you from getting fired."

56. While this statement made no sense to the Plaintiff given what he was told, it would make sense in the course of events that occurred thereafter in January 2026.

57. On or about January 10, 2026, Plaintiff learned for the first time that the City Council planned to select another individual for the Acting Police Chief position.

58. Plaintiff became aware of this when he learned that the January 13, 2026 City Council meeting agenda contained an item for the appointment of Hussein Farhat as the Acting Police Chief.

59. Farhat is an Arab, Lebanese-American, Muslim person.

60. After learning of this prospective appointment, Plaintiff also learned from a person and a reporter of a Detroit area newspaper that there was information in Farhat's background that raised concerns about his fitness to serve as the City's Acting Police Chief.

61. Plaintiff learned that (A) Farhat had been the defendant in two cases wherein the plaintiffs had obtained personal protection orders ("PPO") against him and (B) Farhat allegedly had a prior suicide attempt.

62. Since PPO's had been entered against Farhat, this suggested that Farhat had engaged in violations or suspected violations of the law. As explained in part on the State of Michigan's VOICES4 Hotline: "A Personal Protection Order (PPO) is a court order to stop threats, violence or harassment against you. You can get a PPO to protect you from someone age 10 or older who is threatening, hurting, stalking, or harassing you."

63. Plaintiff had also been informed by the reporter that the PPO cases against Farhat ultimately had been handled such that there was no public record of them with the court.

64. Plaintiff reported directly or indirectly the information in paragraphs 61 and 63 above to City Council members, the Mayor, Lagrou, and Police Department employees.

65. The item for the appointment of Farhat as the Acting Police Chief that was on the January 13, 2026 City Council meeting agenda was pulled.

66. Thereafter, Plaintiff was given unwarranted Notices of Disciplinary Action.

67. On January 13, 2026, he was given a Notice of Disciplinary Action by Captain George for refusing to talk to Captain George about the appointment of the Acting Police Chief.

68. Although related to the Police Department, such discussion was certainly *not* related to the Plaintiff's duties or Captain George's duties. Thus, Captain George had no basis to give the Plaintiff the Notice.

69. On January 20, 2026, Plaintiff was given a Notice of Disciplinary Action by Captain Mervyn for talking to City Council members and Police Department employees about: (A) the PPO cases against Farhat and his alleged suicide attempt, (B) a City Councilman wanting the entire upper command staff of the Police Department to be fired and "gone", and (C) Plaintiff telling the Councilman that firing some employees had to be done through progressive discipline and that he would stand in the way of anyone being unjustly fired if he was selected as Police Chief.

70. The summation paragraph under "**Details of Violation**" of this January 20, 2026 Notice of Disciplinary Action stated: "You have been talking to council as a patrol officer about police department business. You are spreading rumors or misinformation that is disrupting the operations of the department. It is impairing the Command staff doing their jobs efficiently because they are in fear of losing their jobs."

12

71. With respect to "ACTION TAKEN", both Notices of Disciplinary Action stated that the action was to be determined by the Chief of Police.

72. Plaintiff was a union, non-probationary employee who had a contractual right under his union's collective bargaining agreement ("CBA") not to be disciplined or terminated except for just cause.

73. Based on the CBA, Plaintiff thus had employment security in his continued employment with the City.

74. Despite this, Mileski advised the Plaintiff on January 21, 2026 that the Plaintiff was terminated effective on January 23, 2026 as a "Probationary Employee" based on the Notices of Disciplinary Action.

75. Prior to and after the termination of the Plaintiff's employment, the Plaintiff had not been given a *Loudermill* hearing or any notice and opportunity to be heard to contest the termination.

76. Given his position and on information and belief, Lagrou concurred in Mileski's decision to terminate the Plaintiff.

77. On January 27, 2026, the City Council voted to make Farhat the City's Acting Police Chief.

78. After Plaintiff's termination, he was replaced with an Arab, (on information and belief) Yemeni-American, Muslim person.

13

## COUNT I: DEPRIVATION OF THE PLAINTIFF'S FEDERAL CIVIL RIGHTS AS TO ALL DEFENDANTS

79. The Plaintiff incorporates paragraphs 1 through 78 above by reference.

80. This Count is brought pursuant to 42 USC 1983 for the violation of the Plaintiff's rights under the 1st Amendment and the 14th Amendment to the United States Constitution.

81. The Defendants, and each of them, subjected the Plaintiff to adverse employment actions including, but not necessarily limited to, the following:

(a) Failure to promote to or to hire as the Acting Police Chief and/or the Police Chief;

(b) Giving the Plaintiff unwarranted Notices of Disciplinary Action; and

(c) Termination of the Plaintiff's employment, deciding to terminate the Plaintiff's employment, and/or directing the termination of the Plaintiff's employment.

82. The adverse actions taken by the Defendants against the Plaintiff as noted above were taken under color of state law.

83. The adverse actions stemmed from purposeful discrimination, purposeful retaliation, and/or from City's policy(ies) and/or custom(s).  This includes, but is not necessarily limited to, actions taken by the City's City Council, Mileski, and Lagrou as the City's final policymaker(s) for purposes of establishing the City's policy(ies) and/or custom(s).

14

84. The Plaintiff had engaged in conduct, speech, and/or associations protected under the 1st Amendment as part of the rights to freedom of association, to freedom of speech and/or expression, and/or to petition government for the redress of grievances with the conduct, speech, and/or associations being on or related to matters of public concern.

85. The protected conduct, speech, and/or associations include, but are not necessarily limited to, the conduct and/or statements described above in the following paragraphs: 28, 46, 52, and 64. This conduct and/or these statements were matters of public concern and/or related to matters of public concern.

86. The adverse actions violated the Plaintiff's 1st Amendment rights to freedom of association, to freedom of speech and/or expression, and/or to petition government for the redress of grievances in that the adverse actions taken against the Plaintiff as described above were taken due to the Plaintiff's protected association, conduct, statements, actions, and/or activities under the 1st Amendment.

87. The termination of the Plaintiff's employment also violated the Due Process Clause of the 14th Amendment in that the Plaintiff was terminated from his position as a Police Officer without notice and an opportunity to be heard prior to or after being terminated such that Plaintiff was deprived of the property interest he had under Michigan law in his continued employment as a Police Officer.

88.   As a direct and proximate result of the Defendants' violations of the Plaintiff's rights, Plaintiff has sustained damages including (but not necessarily limited to) the following:

      (a)  Loss of income;

      (b)  Loss of fringe benefits;

      (c)  Loss of pension and/or Social Security benefits;

      (d)  Severe mental anguish and distress;

      (e)  Embarrassment and humiliation;

      (f)  Mental anguish stemming from the outrage he experienced as a result of the actions against him;

      (g)  Fright, shock, and mortification;

      (h)  Pain and suffering;

      (i)  Damage to reputation;

      (j) Liquidated damages;

      (k) Punitive damages; and

      (l)  Costs and attorney fees.

WHEREFORE, your Plaintiff respectfully requests this Honorable Court to enter a judgment in his favor against the Defendants, jointly and severally, awarding him an amount in excess of Five Million ($5,000,000.00) Dollars to which he is entitled for compensatory, exemplary, liquidated, and punitive

damages; granting him equitable relief (including expungement of false information from his personnel record); and awarding him costs, interest, and attorney fees so wrongfully incurred.

<u>COUNT II: VIOLATION OF RIGHTS UNDER THE WHISTLEBLOWERS'<br>PROTECTION ACT AS TO ALL DEFENDANTS</u>

89. The Plaintiff incorporates paragraphs 1 through 88 above by reference.

90. Under the Whistleblowers' Protection Act ("WPA"), the Defendants were and/or are "employers" for all times material to this Complaint.

91. Under the WPA, each Defendant was also a "public body" for all times material to this Complaint.

92. Under the WPA, the Plaintiff was an "employee" for all times material to this Complaint.

93. Under the WPA, the Plaintiff's protected conduct, speech, and/or activities include, but are not necessarily limited to, those described in paragraphs 28, 46, and 64 above.

94. That is, by engaging in this conduct, speech, and/or activities, the Plaintiff did report a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body.

95. The Defendants thus violated the WPA by taking the adverse actions that they did against the Plaintiff as described at paragraph 81 above due to his above-

17

described protected conduct, speech, and/or activities.

96. As a direct and proximate result of the Defendants' violations of the Plaintiff's rights, Plaintiff has sustained damages including (but not necessarily limited to) the following:

      (a)  Loss of income;

      (b)  Loss of fringe benefits;

      (c)  Loss of pension and/or Social Security benefits;

      (d)  Severe mental anguish and distress;

      (e)  Embarrassment and humiliation;

      (f)  Mental anguish stemming from the outrage he experienced as a result of the actions against him;

      (g)  Fright, shock, and mortification;

      (h)  Pain and suffering;

      (i)  Damage to reputation;

      (j) Liquidated damages;

      (k) Punitive damages; and

      (l)  Costs and attorney fees.

WHEREFORE, your Plaintiff respectfully requests this Honorable Court to enter a judgment in his favor against the Defendants, jointly and severally, awarding him an amount in excess of Five Million ($5,000,000.00) Dollars to

which he is entitled for compensatory, exemplary, liquidated, and punitive damages; granting him equitable relief (including expungement of false information from his personnel record); and awarding him costs, interest, and attorney fees so wrongfully incurred.

### COUNT III:  DISCRIMINATION BASED ON RELIGION, RACE, COLOR, AND/OR NATIONAL ORIGIN IN VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT AS TO ALL DEFENDANTS

97. Plaintiff incorporates paragraphs 1 through 96 above by reference.

98. For all times material to this Complaint, the Plaintiff was an "employee" and/or an "individual" within the meaning of the ELCRA.

99. For all times material to this Complaint, each Defendant was an "employer" within the meaning of the ELCRA.

100. Plaintiff was discriminated against by the Defendants in the terms and conditions of his employment and his prospective employment because of his race, color, national origin, and/or religion in violation of the ELCRA.

101. Specifically, the Defendants took the adverse employment actions more fully described at paragraph 81 above against the Plaintiff because of his race, color, national origin, and/or religion.

102. As a direct and proximate result of the Defendants' violations of the Plaintiff's rights, Plaintiff has sustained damages including (but not necessarily limited to) the following:

19

(a)  Loss of income;

(b)  Loss of fringe benefits;

(c)  Loss of pension and/or Social Security benefits;

(d)  Severe mental anguish and distress;

(e)  Embarrassment and humiliation;

(f)  Mental anguish stemming from the outrage he experienced

as a result of the actions against him;

(g)  Fright, shock, and mortification;

(h)  Pain and suffering;

(i)  Damage to reputation;

(j) Liquidated damages;

(k) Punitive damages; and

(l)  Costs and attorney fees.

WHEREFORE, your Plaintiff respectfully requests this Honorable Court to enter a judgment in his favor against the Defendants, jointly and severally, awarding him an amount in excess of Five Million ($5,000,000.00) Dollars to which he is entitled for compensatory, exemplary, liquidated, and punitive damages; granting him equitable relief (including expungement of false information from his personnel record); and awarding him costs, interest, and attorney fees so wrongfully incurred.

DEMAND FOR TRIAL BY JURY IS HEREBY MADE.

DATED: April 21, 2026                  /s/ GARY T. MIOTKE_____
                                       GARY T. MIOTKE (P41813)
                                       Attorney for Plaintiff